JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 883 | DATE | 3/11/2003 |
| CASE TITLE | Nancy Gunning-Sluby vs. Asset Allocation & Management Co. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at_____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER: Defendant Asset Allocation & Management Company's Motion for Summary Judgment is granted to Counts I and II.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | MAR 1 2 2003 |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| WAP | courtroom deputy's initials | date mailed notice |

Document Number: 26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
MAR 1 1 2003
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

NANCY GUNNING-SLUBY,

    Plaintiff,

v.

ASSET ALLOCATION & MANAGEMENT
COMPANY, L.L.C.,

    Defendant.

Case No. 02 C 0883

Hon. Harry D. Leinenweber

DOCKETED
MAR 1 2 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Nancy Gunning-Sluby ("Gunning-Sluby" or "Plaintiff") filed a two-count complaint against Asset Allocation & Management Company, L.L.C. ("AAM") alleging gender discrimination and retaliation. Before the Court is AAM's Motion for Summary Judgment filed pursuant to FED. R. CIV. P. 56. For the following reasons, the Court grants the motion.

## BACKGROUND

The backdrop of this case is that AAM, an investment company, in 2001 and 2002, faced repeated structural reorganization and petty squabbles and breakdowns in communication between partners and directors. Plaintiff had begun her career at AAM in 1989, in what appears to have been a less dysfunctional time at the company. From her initial position as a marketing assistant, Gunning-Sluby moved through AAM's ranks, serving as Marketing Manager and eventually taking on the duties of Office Manager in addition to her marketing



responsibilities. In April 2001, AAM promoted Gunning-Sluby to Chief Operating Officer ("COO").

Around the time of Gunning-Sluby's promotion, AAM changed its operating structure from a partnership to a limited liability company in order to facilitate a substantial investment from CenCo Investment L.L.C. ("CenCo"). On June 1, 2001, AAM entered into an Operating Agreement with CenCo that required the Board of Directors to appoint all AAM officers. The Board only appointed one corporate officer at the time, naming Barry Hoyt ("Hoyt") as Chief Executive Officer. In October 2001, at the suggestion of Allan Fulkerson ("Fulkerson"), the main CenCo shareholder and a member of the AAM Board, AAM hired Geoffrey Getman ("Getman") as Chief Operating Officer and Deputy Investment Officer and changed Gunning-Sluby's position to Marketing Coordinator.

AAM cited Gunning-Sluby's marketing experience and the needs of an increasingly troubled company as reasons for this reorganization. At the time, AAM's growth was hampered by the refusal of the two primary marketing directors, Patrick Livney ("Livney") and Clay Johnston ("Johnston"), to speak to each other due to disagreements over marketing strategy. Gunning-Sluby's new responsibilities included overseeing several marketing-related initiatives, but also included mediating between these two men. Unbelievable as it may seem, AAM was able to point to a *separate* dispute between its partners to explain the decision to hire Getman. By the autumn of 2001, an unpleasant "rift" had also developed between Hoyt and AAM's

Chief Investment Officer, Peter Mavrogenes ("Mavrogenes"). AAM explained to Gunning-Sluby that it was hiring Getman to serve under both men and to bridge *that* fracture.

AAM presented the shift in Gunning-Sluby's job responsibilities as a promotion, and provided her with a $10,000 pay raise. Gunning-Sluby, however, believed that the job change was a demotion based on her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Accordingly, she filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") on November 9, 2001 and filed suit on February 5, 2002.

Gunning-Sluby claims that AAM retaliated against her as a result of her discrimination charges. She alleges that Fulkerson, who was her direct supervisor, ended all contact with her and that a consultant hired by AAM to assess employees' job functions behaved aggressively toward her. Gunning-Sluby resigned from AAM on February 21, 2002 but alleges that she was constructively discharged due to AAM's retaliatory behavior. She filed an additional EEOC claim alleging retaliation on February 25, 2002 and an amended complaint on March 5, 2002.

## DISCUSSION

### *Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In assessing the movant's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the employment discrimination context, summary judgment is warranted where "the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer had discriminated against the plaintiff." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570 (7th Cir. 1989).

## *COUNT I - GENDER DISCRIMINATION*

Title VII makes it unlawful for an employer to terminate or otherwise to discriminate against an employee based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). In Count I, Gunning-Sluby charges that AAM violated Title VII by discriminating against her based on her sex.

A plaintiff may prove unlawful discrimination in an employment discrimination action through either direct evidence of improper motive or the indirect burden shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Gunning-Sluby chooses to proceed under the indirect method and, therefore, must first establish a *prima facie* case of discrimination by demonstrating that: (1) she was a member of a protected class; (2) she performed her job according to AAM's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees outside of her protected class. *See, e.g., Markel v. Bd. of Regents of the Univ. of Wisc. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001). If Gunning-Sluby can show that "there is some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion," *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir. 1997), a presumption of discrimination arises, and AAM must produce evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination. *Gordon*, 246

- 5 -

F.3d at 886. If AAM is successful, the burden shifts back to Gunning-Sluby to show that AAM's proffered reason for termination is pretextual. *Id.* Gunning-Sluby need not provide direct evidence of discrimination, but must merely meet her respective burdens. *Id.*

AAM does not contest that Gunning-Sluby is a member of a protected class, or that she performed her job satisfactorily. Instead, AAM argues that Gunning-Sluby did not suffer the requisite adverse employment action when she was made Marketing Coordinator instead of Chief Operating Officer and Deputy Chief Investment Officer. The determination of whether an employment action is adverse is fact-specific, however, at a minimum, the job action must be "materially adverse" and must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Instead, "an employee must show that material harm has resulted from . . . the challenged actions." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)(internal quotation marks omitted). The Seventh Circuit has provided examples of materially adverse job actions, including "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady*, 993 F.2d at 136.

Gunning-Sluby contends that she faced significantly diminished duties as Marketing Coordinator and that this downward turn rose to

the level of an adverse employment action. She argues that she went from having clearly established responsibilities over almost all areas of AAM to playing a vague and undefined role in the single area of marketing, an area her supervisor knew she did not like. Gunning-Sluby further asserts that her new position stymied her opportunities for advancement as Fulkerson, her Marketing Coordinator supervisor, was both temporary and rarely available. In support of her claim, Gunning-Sluby cites several cases in which the Seventh Circuit found a reduction in material responsibilities severe enough to constitute an adverse employment action. *See, e.g., Dahm v. Flynn*, 60 F.3d 253 (7th Cir. 1994)(changing plaintiff's duties from a mix of intellectually stimulating and routine job responsibilities to only routine duties is a "dramatic downward shift in skill level" that "can rise to the level of an adverse employment action"); *Collins v. Illinois*, 830 F.2d 692 (7th Cir. 1987)(finding adverse employment action where employee was transferred to a position with no specific duties, taken out of her own office and placed at a receptionist-type desk, denied a telephone, removed from professional publications, and no longer given business cards).

Yet while Gunning-Sluby had different responsibilities as Marketing Coordinator, those responsibilities were not markedly less substantial or less challenging than those she had as COO. *See, e.g., Crady*, 993 F.2d at 136 (finding no materially adverse action in transfer from assistant vice president and branch manager position to loan officer position despite change in responsibilities). Despite

- 7 -

her claim that the new job was vague and undefined, Gunning-Sluby concedes that Fulkerson assigned her specific projects. As COO, she administered personnel and company polices, oversaw AAM's small information technology and accounting departments, monitored the company's relationships with vendors, and presided over the completion of internal financial reports. She had no involvement in asset management or allocation for AAM's clients. As Marketing Coordinator, Gunning-Sluby was assigned several substantial projects including the creation of a sales and marketing plan, the establishment of a competitor database, and the preparation of sales tracking reports. Moreover, in December 2001, shortly after being made Marketing Coordinator, Gunning-Sluby was responsible for organizing an AAM marketing meeting and described herself as being involved "in the processes" of numerous marketing projects covered in that meeting. These projects included AAM's marketing organization, marketing budget, current and future target markets, commission schedule, marketing brochures, new hires, process and compliance, marketing fees, advertising, public relations, and accountability.

Gunning-Sluby offers no further evidence that the job shift caused her material harm. She states that the Marketing Coordinator role provided her no opportunity for advancement, but fails to demonstrate that she had any advancement opportunities as COO which she subsequently lost. Indeed, Gunning-Sluby does not rebut Fulkerson's contention that the sales and marketing areas into which she was placed were the "key to the future of the firm." (Fulkerson

Dep. at 61.) Gunning-Sluby suffered no loss of benefits or salary and instead received a $10,000 raise with her new position. And while her new title as Marketing Coordinator was arguably less prestigious than her COO title that is not sufficient, on its own, to establish a materially adverse employment action. *Crady*, 993 F.2d at 136. Without proof of an adverse employment action, Gunning-Sluby cannot establish a *prima facie* case of discrimination.

Moreover, Gunning-Sluby essentially ignores the fourth prong of the *McDonnell Douglas* test, and provides no evidence that she was treated differently than similarly situated male employees. She merely suggests, in her discussion of pretext, that Getman was similarly situated and treated more favorably than she was. Even if this Court takes that vague reference as an attempt to establish the final prong of the *prima facie* case, it would fail. A plaintiff must demonstrate that another employee who is "directly comparable to her in all material respects" was treated more favorably. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). In determining whether an employee is directly comparable for purposes of this prong, courts look at factors such as experience, education and qualifications if those factors were considered by the employer in making its personnel decisions. *Id.* In the reorganization that stemmed from the June 2001 Operating Agreement, AAM expanded the COO role to COO and Deputy Chief Investment Officer, a role that required someone with investment experience. Getman had an MBA from Columbia University while Gunning-Sluby had just begun to take classes toward

an MBA. Getman had twenty years of asset management and investment experience and had served as the COO of a large corporation. Gunning-Sluby had no experience in asset management or investment either in her position as COO or elsewhere. Getman, unlike Gunning-Sluby, was also new to AAM and brought with him a helpful distance from the problems between Hoyt and Mavrogenes. Getman and Gunning-Sluby were not similarly situated candidates for the COO and Deputy Chief Investment Officer position.

By failing to satisfy these two prongs of the *McDonnell Douglas* test, Gunning-Sluby has failed to establish a *prima facie* case of discrimination. Even if Gunning-Sluby had cleanly hurdled the *prima facie* barrier, however, she would have stumbled at the pretext stage. As discussed, AAM explains that it hired Getman because it needed an outsider with corporate management experience to handle the internal turmoil, and because Getman, unlike Gunning-Sluby, had an MBA and experience managing company assets. It placed Gunning-Sluby in the Marketing Coordinator position because she had extensive marketing experience and the respect of the warring parties in the marketing department.

Gunning-Sluby may show that these reasons are pretextual by "presenting evidence tending to prove that [AAM's] proffered reasons are factually baseless, were not the actual motivation for the [action] in question, or were insufficient to motivate the [action]." *Nawrot v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002)(internal quotation marks omitted). If AAM "honestly believed" its reasons for

its actions, however, she cannot prove pretext, even if those reasons are "foolish or trivial or even baseless." *Gordon*, 246 F.3d at 889 (internal quotation marks omitted). Gunning-Sluby attempts to demonstrate pretext by arguing that: 1) she was placed in the COO position to restructure the firm; 2) AAM's former partners saw her as a perfect choice for COO; 3) Getman's poor performance as COO and subsequent removal from the position demonstrated that he was unqualified; 4) Hoyt and Fulkerson provided conflicting reasons for hiring Getman; and 5) AAM has a history of sexual discrimination. None of these arguments is persuasive.

First, Gunning-Sluby was placed in the COO position and was viewed as a "perfect choice" for that position before the problems between Hoyt and Mavrogenes arose, and before AAM expanded the COO position to include investment management responsibilities. Second, at the time Getman was hired, it was perfectly reasonable, based on his impressive resume and on recommendations from others, for AAM to believe that he was highly qualified. Third, Hoyt and Fulkerson offered different reasons for hiring Getman, but these reasons were neither mutually exclusive nor contradictory.[1] Finally, Gunning-

---

[1] Gunning-Sluby argues that Fulkerson's actual motive, to hire a man as COO, is supported by his alleged comment that he wanted someone with "less hair." According to Plaintiff's deposition, however, Fulkerson's actual statement was that he wanted to "bring someone else into the mix to alleviate the problems that were going on" and that he felt he needed someone with "gray hair or less hair." (Pl. Dep. at 178.) No reasonable juror could infer from these comments that Fulkerson was intent on hiring a male COO. "Gray hair" is not a gender-specific description, and as Gunning-Sluby concedes, simply means someone older than her, which Getman was. In this context, "less hair" means, at most, a balding male, another way of indicating that Fulkerson wanted someone older or with more experience as COO and Deputy Chief Investment Officer. Standing alone, an unlikely interpretation of a fragment of Fulkerson's comments is not sufficient

- 11 -

Sluby's allegations of sexual discrimination are often unsubstantiated and vague and she adduces no evidence linking any decision maker in this case to any incidents of sexual discrimination. Moreover, none of those alleged incidents involved Gunning-Sluby or the employment action at issue. *See Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 623 (7th Cir. 2001)("[S]tray remarks, unrelated to the employment decision in question [are] . . . insufficient to support an inference of pretext.")

### *COUNT II - RETALIATION CLAIM*

Title VII not only prohibits certain forms of job discrimination, but also prohibits employers from retaliating against employees who complain about such forms of discrimination. *Miller*, 203 F.3d at 1007. In Count II, Gunning-Sluby alleges that AAM retaliated against her for filing both the November 9, 2001 EEOC charge and the February 5, 2002 lawsuit alleging sex discrimination. Gunning-Sluby chooses to demonstrate retaliation through the indirect route, which requires that she prove "that after filing the charge only [she], and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [she] was performing [her] job in a satisfactory manner." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). If Gunning-Sluby successfully establishes the required

---

evidence to combat AAM's reasonable explanations for its personnel decisions. *See Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 742 (7th Cir. 2002)("To establish pretext, [a plaintiff] must show that [the discriminatory reason] was *the determining factor* in [the] discharge.")(emphasis in original).

elements, AAM may still be entitled to summary judgment if it "presents unrebutted evidence of a noninvidious reason for the adverse action." *Id.*

Once again, the parties clash over whether Gunning-Sluby suffered an adverse employment action after she filed her discrimination charge and her lawsuit. Gunning-Sluby argues that she was constructively discharged by AAM in retaliation for her actions. Constructive discharge, however, requires that Gunning-Sluby establish two prongs: "First, a plaintiff needs to show that [her] working conditions were so intolerable that a reasonable person would have been compelled to resign. Second, the conditions must be intolerable because of unlawful discrimination." *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999)(internal quotation marks and citation omitted). The Seventh Circuit has found constructive discharge in cases where the plaintiff faced serious physical threats, *see, e.g., Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188 (7th Cir. 1992)(plaintiff's employer placed a gun to plaintiff's head, took a photograph of the scene and circulated it at a company meeting while stating that "this is what a nigger looks like with a gun to his head"), or where the plaintiff was relentlessly degraded based on her sex, had her property mutilated and defaced, and endured male workers exposing themselves to her. *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007 (7th Cir. 1994). In contrast, the Court found that plaintiffs fell "well short" of the constructive discharge standard in *Drake v. Minn.*

*Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998), despite the fact that the plaintiffs were shunned by co-workers, had personal belongings removed from a locker, and received sexually explicit and racially offensive telephone calls at home. Similarly, in *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993), where the employer allegedly excluded plaintiff from office activities, offered her inadequate supervisory support, assigned her to a low-performing sales territory and failed to assign her to new accounts, the Court held that the working conditions were not "so onerous or demeaning that [plaintiff] was compelled to leave her employment." *Id.*

The working conditions described by Gunning-Sluby simply do not approach those endured by plaintiffs in successful constructive discharge cases. Gunning-Sluby bases her constructive discharge claim on treatment by Fulkerson and by Barry Atkins, a consultant hired by AAM in December 2001 to evaluate employees' roles and job functions as part of the company reorganization. Even construing the facts in the light most favorable to the Plaintiff, however, it remains that Gunning-Sluby bases her constructive discharge claim on three tolerable events and actions: 1) a December 2001 meeting with Atkins, in which Atkins behaved aggressively and condescendingly towards her in their conversations about her job functions; 2) a lack of contact with Fulkerson after December 19, 2001 that left her professionally adrift; and 3) a February 20, 2002 meeting with Atkins, during which Atkins told her that AAM's Board felt that, in

light of her lawsuit, Fulkerson should cease contact with Gunning-Sluby and that she should report to Atkins.

No reasonable juror could find that these incidents created an unendurable workplace. Although Gunning-Sluby asserts that Atkins failed "to assure her that she had a future role in the organization," her deposition testimony reveals that Atkins told her that she should view the company uncertainty as an opportunity to determine the parameters of her new role. Atkins's other comments merely indicate that he was unfamiliar with AAM's structure and with Gunning-Sluby's role in the company, not that he saw no future for Gunning-Sluby at AAM. Atkins perhaps should have been more conscious of his demeanor and tone, but his unpleasant manner did not make AAM an intolerable workplace. As for Fulkerson, Gunning-Sluby adduces no evidence to show that his lack of contact with her had any effect on her career. Shunning is only an adverse employment action when it "causes material harm to the plaintiff." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998); *see also McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996). Before filing her EEOC charge, and before the alleged shunning, Gunning-Sluby had undertaken several marketing projects with little interaction with Fulkerson and, therefore, should not have been materially affected by his continued absence. Indeed, Atkins told Gunning-Sluby that she had control over the direction she could take as Marketing Coordinator. Gunning-Sluby also acknowledges that on February 13, 2002, AAM's Board ordered all employees to

report to Hoyt or to Hoyt's designee. At that point it was clearly immaterial that Fulkerson would no longer have contact with her, as he was no longer her supervisor.

Gunning-Sluby also fails to show that the supposed constructive discharge was retaliatory. She alleges that Fulkerson ceased contact with her in response to her November 9, 2001 EEOC charge, yet she concedes that she worked on a project for Fulkerson in December 2001 and participated in an AAM marketing meeting with him on December 18, 2001. Her allegation is further belied by the fact that AAM gave her a $25,200 bonus a month after she filed her EEOC charge. In the February 20, 2002 meeting, Atkins told Gunning-Sluby that she would not hear from Fulkerson because of the lawsuit. It is unclear, however, that Atkins' request that Gunning-Sluby report to him was linked to anything more than the Board's company-wide mandate that *all* employees report to Hoyt or to his designee.

Not only does Gunning-Sluby fail to prove that she suffered an adverse employment action in retaliation for her EEOC claim and law suit, she also fails, once again, to point to any similarly situated employee who did not file an EEOC charge or lawsuit and who was not treated adversely by AAM. Hostilities between Hoyt and Mavrogenes and between Livney and Johnston, Gunning-Sluby's colleagues in the marketing department, combined with the October 2001 reorganization and a subsequent reorganization on February 13, 2002, crippled AAM. It seems that most AAM employees, not just Gunning-Sluby, were stumbling their way through an increasingly troubled organization.

Indeed, in January 2002, Livney was told to work from home and on February 15, 2002, Mavrogenes resigned because of the work environment. Neither Livney nor Mavrogenes had filed EEOC claims or lawsuits against AAM.

Due to Gunning-Sluby's failure to establish the basic elements of a retaliation claim, this Court need not address the nondiscriminatory reasons that AAM puts forward for its actions.

### **CONCLUSION**

For the reasons set forth above, AAM's Motion for Summary Judgment is **granted** to Counts I and II.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: March 11, 2003

AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

Nancy Gunning-Sluby

v.

Asset Allocation & Management
Company, L.L.C.

**JUDGMENT IN A CIVIL CASE**

Case Number: 02 C 883

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☒ Decision by Court. This action came before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the Motion for Summary Judgment by defendant Asset Allocation & Management Company is granted as to Counts I and II.

Michael W. Dobbins, Clerk of Court

Date: 3/11/2003

Wanda Parker, Deputy Clerk